Filed 5/26/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOSE BUSTAMANT CARDENAS,<br><br>    Defendant and Appellant. | B341680<br><br>(Los Angeles County<br>Super. Ct. No. NA119411) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura Laesecke, Judge.  Affirmed in part and reversed in part with directions.

Dan E. Chambers, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran, Laura Sanchez and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Penal Code section 1170, subdivision (b)[1] permits a court to impose an upper term sentence "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (*Id.*, subd. (b)(2).) We hold that a trial court must allow a defendant who exercises his or her right to a jury trial under this provision the opportunity to argue to the jury what findings it should make as to such alleged aggravating circumstances.

Defendant and appellant Jose Bustamant Cardenas shot and killed 15-year-old Joshua Simmons when Simmons tried to steal his cell phone. A jury convicted Cardenas of one count of voluntary manslaughter (§ 192, subd. (a)) and found that he personally used a firearm in the commission of the offense (§ 12022.5, subd. (a)). Cardenas asserted his right to a trial by jury on three aggravating factors that could be used to impose a high term sentence (see § 1170, subd. (b)(2)), and following his conviction the jury was asked to make findings as to those factors in a second phase of the trial. The trial court refused his attorney's request to argue the aggravating factors to the jury, instructed the jury as to the factors at issue, and after deliberation the jury found all three aggravating factors true. The court sentenced Cardenas to the middle term of six years for manslaughter but imposed an additional consecutive sentence of 10 years, the high term for the firearm enhancement.

---

[1] Unspecified statutory references are to the Penal Code.

2

Cardenas contends that the denial of closing argument violated his Sixth Amendment right to assistance of counsel, that the error was structural, and that we must therefore reverse the imposition of the high term for the enhancement regardless of whether the denial of closing argument prejudiced him. We agree with Cardenas that the trial court erred. We need not decide whether this was structural error because even if we review for prejudice under the standard established in *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705], the People have not shown the error was harmless beyond a reasonable doubt. Accordingly, we vacate the sentence for the enhancement and remand for further proceedings.

## FACTUAL BACKGROUND

The only witness who testified about the events leading up to the shooting was Cardenas himself. He stated that he had listed a lavender-colored cell phone for sale online, and someone agreed to purchase it for $500 in cash. On the evening of April 15, 2022, he went to a community center in Long Beach to meet the buyer, whom Cardenas knew only by his online identity. Cardenas had a loaded semiautomatic gun in the pocket of his shorts. He testified that he had purchased the gun a few months earlier and routinely carried it with him for protection in his job as a delivery driver after a customer brandished a weapon at him. The community center was dark, with few people around, and the buyer would not reply to Cardenas's messages asking where he was. Cardenas became "[n]ervous" and "started getting scared." Eventually he turned around and saw Simmons approaching. Simmons confirmed he was there to buy the phone. He asked if all the features were working and asked to see the phone. Cardenas held the phone up to show it was working, and

3

Simmons grabbed it. Simmons looked at it for a couple of seconds, then turned and started running.

Surveillance video footage showed what happened next. Cardenas opened fire, emptying the magazine at Simmons. As Simmons fell to the ground, he threw the cell phone toward Cardenas and said, "I'm sorry I'm sorry." Cardenas picked up the phone and ran away. Simmons died at the scene. A medical examiner determined Simmons was shot six times, with one bullet entering his upper back and exiting through his neck, and another entering his back and exiting through his upper chest.

Shortly after the shooting, Cardenas called 911 and agreed to meet with police at a nearby gas station. Cardenas was cooperative and told an officer he had a handgun. The officer searched Cardenas and found an unloaded semiautomatic handgun in his pants pocket. The gun appeared to have a blood stain on its barrel. A detective later searched Cardenas's vehicle and found a lavender or purple phone with blood stains on it.

In his trial testimony, Cardenas claimed that he became nervous when he first encountered Simmons because Simmons "kept on reaching for his waistband." As Simmons turned to run, he took his hand off his waistband, and Cardenas thought Simmons might be taking out a firearm. Cardenas then began firing. Cardenas explained that he ran away after recovering the phone because he had seen three other people nearby and feared they would come after him. He went back to his car, where his fiancée was waiting, and drove away. He dialed 911 and told the operator what had happened. He then drove to the gas station where he agreed to meet police officers.

## TRIAL COURT PROCEEDINGS

The People charged Cardenas with one count of murder (§ 187, subd. (a)), with an allegation that he personally used a firearm in the offense (§ 12022.5, subd. (a)).  The People also alleged two aggravating factors: that the offense involved great violence, great bodily harm, and other acts disclosing a high degree of cruelty, viciousness, and callousness (Cal. Rules of Court, rule 4.421(a)(1)), and that Cardenas was armed with and used a weapon in the offense (*id.*, rule 4.421(a)(2)).  The jury acquitted Cardenas of murder but convicted him of voluntary manslaughter and found true the firearm allegation.

At the conclusion of the guilt phase of the trial, Cardenas asserted his right to trial by jury on the aggravating factors (see § 1170, subd. (b)(2)), and the People alleged a third aggravating factor: that the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)).  Cardenas's attorney objected to the inclusion of this new aggravating factor on the ground that she did not have an opportunity to prepare a defense to it at trial.[2] The court overruled the objection.  Neither side sought to adduce additional evidence regarding the aggravating factors. Cardenas's attorney did request an opportunity to argue to the jury about the aggravating factors, and the court denied the request.  The jury then returned to the courtroom, received instruction on the aggravating factors, and retired to deliberate without defense counsel or the prosecutor having the opportunity to address with the jurors the meaning of the instructions or how the jury should apply them to the evidence.  The jury found all three aggravating factors true.

---

[2] Cardenas does not pursue this claim on appeal.

At the later sentencing hearing, the court imposed the middle term sentence of six years for voluntary manslaughter. In explaining its choice of sentence, the court noted that Cardenas responded to Simmons's attempt to flee almost instantaneously by pulling out his gun and opening fire. The court also cited Cardenas's apparent lack of remorse both during the trial and in the recording of his 911 call shortly after the shooting. On the other hand, the court recognized mitigating factors: that Cardenas was only 24 years old at the time of the crime, that he turned himself in, and that he had no prior criminal record.

The court also stated that "there is a perception that citizens can steal property and get away with it without consequences. That is just I think the general perception right now. And I think because of that, people who are the victims of the stolen property feel vulnerable. They feel frustrated. They feel like they don't have any sense that there is going to be justice." The court suggested that the jurors may have convicted Cardenas of manslaughter rather than murder because they believed he was frustrated and angry at the theft of his phone, and he had to take matters into his own hands.

The court imposed the high term of 10 years for the firearm enhancement based on the aggravating factor that the victim was particularly vulnerable. The court stated, "You emptied your gun. You emptied it in him. [You could have fired o]ne shot. One shot to scare him. One shot to get him to turn around to give you your phone back. One shot to impress upon him that you were armed, but you emptied the entire magazine into him. That's why it's a high term [for] gun use.

"And in that video you can see he is running. He is fleeing for his life. He falls. You keep shooting, and then he collapses on

6

the basketball court saying 'sorry.'  Something you have never said."

## DISCUSSION

### A.  The Trial Court Erred by Denying Cardenas's Counsel an Opportunity to Argue the Aggravating Circumstances

Under the determinate sentencing scheme, the court may not impose an upper-term sentence unless an aggravating circumstance applies.  (§ 1170, subd. (b)(2).)  Current law further requires that "the facts underlying [any such aggravating] circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."  (*Ibid*.)

The right to a jury trial on aggravating circumstances has been a part of the determinate sentencing scheme only since 2022.  (*People v. Lynch* (2024) 16 Cal.5th 730, 747 (*Lynch*).)[3]  As a result, there is little case law on the procedures courts must follow in such a trial.  In particular, the issue of whether a defendant has a right to argument by counsel on the subject of the aggravating circumstances is a matter of first impression.

---

[3] The enactment of Senate Bill No. 567 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 731) created the right to a jury trial on aggravating circumstances.  Previous to this change, the trial court had the discretion to select whichever term "best serves the interests of justice."  (Former § 1170, subd. (b).)  Because the court could impose an upper-term sentence regardless of the presence of aggravating circumstances, there was no need for the jury to make a finding on those circumstances.  (*Lynch, supra,* 16 Cal.5th at pp. 747-748.)

The right to closing argument at trial is well established.  A criminal defendant's attorney is entitled both under state law (§ 1093, subd. (e)) and as part of the defendant's Sixth Amendment right to counsel "to make a closing summation to the jury, no matter how strong the case for the prosecution may appear to the presiding judge."  (*Herring v. New York* (1975) 422 U.S. 853, 858 [95 S.Ct. 2550, 45 L.Ed.2d 593], fn. omitted; accord, *People v. Benavides* (2005) 35 Cal.4th 69, 110.)  We see no principled reason why that right does not apply to a jury finding on aggravating circumstances, and the People do not offer one.  Instead, they argue the denial of argument on this subject was a legitimate exercise of the court's "great latitude in controlling the duration and limiting the scope of closing summations."  (*Herring*, *supra*, at p. 862; accord, *People v. Marshall* (1996) 13 Cal.4th 799, 854-855 ["the trial court retains discretion to impose reasonable time limits and to ensure that argument does not stray unduly from the mark"].)

The People cite cases in which limitations on closing arguments were upheld as legitimate exercises of the trial court's discretion, but those restrictions do not compare to this case.  In *People v. Marshall*, *supra*, 13 Cal.4th 799, defense counsel in a death penalty case intended to compare the defendant's case with other cases in which juries in the county had returned death verdicts.  (*Id.* at p. 853.)  The court allowed the attorney to make general comparisons with other cases but "ruled defense counsel could not argue the facts of those cases in detail."  (*Id.* at p. 854.)  Our Supreme Court held this was a valid exercise of the trial court's discretion because it "did not preclude [the] defendant from making his central point: that there have been murder cases involving more shocking, heinous, cruel or callous facts than

those present here." (*Ibid.*) Similarly, in *People v. Simon* (2016) 1 Cal.5th 98, the high court upheld the trial court's refusal to allow defense counsel to distinguish the defendant from notorious murderers such as Timothy McVeigh and Charles Manson because "counsel was not precluded from making his central argument that not every person . . . found liable for special circumstances murder deserves the death penalty." (*Id.* at p. 149.)

Courts have affirmed other similar restrictions on the subject matter of closing arguments (e.g., *People v. Farmer* (1989) 47 Cal.3d 888, 922 [defense counsel could not read from the prosecutor's comments in a separate trial]; *People v. Ponce* (1996) 44 Cal.App.4th 1380, 1388-1390 [defense counsel was barred from arguing a theory unsupported by the evidence]) and have approved reasonable limits on its duration (e.g., *People v. Orchard* (1971) 17 Cal.App.3d 568, 575). But the People cite no cases, nor have we found any, where a court endorsed the trial court's refusal to allow *any* argument on a subject as to which the jury was required to make a finding. Nor would we expect to. A court could not prevent counsel from making any argument at all about an element of an offense, or an enhancement allegation, and the same holds true with regard to aggravating sentencing factors. If one has the right to a jury trial, one has the right to address the jury. The court may impose reasonable limitations on that address, but it may not eliminate it altogether.

## B. Prejudice

Cardenas argues that the denial of closing argument on the aggravating circumstances constitutes structural error, requiring reversal without any showing of prejudice. The United States Supreme Court has distinguished between "trial error," in which

9

a violation of a defendant's constitutional rights is reviewable for harmless error under the standard adopted in *Chapman v. California, supra*, 386 U.S. at p. 24 and "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309 [111 S.Ct. 1246, 113 L.Ed.2d 302].) Cases involving structural error "contain a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' [(*Arizona v.* ]*Fulminante, supra,* at [p.] 310.[)] Such errors 'infect the entire trial process,' [citation] and 'necessarily render a trial fundamentally unfair,' [citation]. Put another way, these errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.' " (*Neder v. United States* (1999) 527 U.S. 1, 8-9.) Some Sixth Amendment violations, such as the complete denial of the assistance of counsel, constitute structural error (*id.* at p. 8), but other lesser violations, such as the failure to instruct the jury on an element of an offense, are analyzed as trial error. (*Lynch, supra*, 16 Cal.5th at pp. 750-751.)

We are aware of no authoritative case law clearly categorizing the denial of closing argument as to sentencing issues as either structural or trial error. Some cases have suggested that the complete denial of *any* closing argument at trial (something that did not occur here) is structural. In *Herring*, which predated the court's use of the term "structural error," the United States Supreme Court reversed the defendant's conviction on the ground that his attorney had been denied closing argument at a bench trial. (See *Herring v. New York*,

10

*supra*, 422 U.S. at pp. 863-865.) The court did not analyze whether the denial prejudiced the defendant, in part because the court recognized it is difficult to estimate the effect of an argument that never occurred: "Some cases may appear to the trial judge to be simple—open and shut—at the close of the evidence. And surely in many such cases a closing argument will, in the words of Mr. Justice Jackson, be 'likely to leave [a] judge just where it found him.' But just as surely, there will be cases where closing argument may correct a premature misjudgment and avoid an otherwise erroneous verdict. And there is no certain way for a trial judge to identify accurately which cases these will be, until the judge has heard the closing summation of counsel." (*Id.* at p. 863, fns. omitted.) In a later opinion, the court in dicta characterized *Herring* as an example of a case where the defendant "had actually or constructively been denied counsel by government action" and where the court "found a Sixth Amendment error without requiring a showing of prejudice." (*Bell v. Cone* (2002) 535 U.S. 685, 696, fn. 3 [122 S.Ct. 1843, 152 L.Ed.2d 914].)

Our own Supreme Court held that the denial of any closing argument in a juvenile delinquency proceeding was equivalent to the complete denial of counsel and required reversal "without inquiry into the question of prejudice." (*In re William F.* (1974) 11 Cal.3d 249, 255-256.)[4] The court's reasoning was similar to that in *Herring*. "[N]o realistic measure of prejudice resulting from counsel's nonparticipation can be made when, because of the

_____

[4] The court subsequently limited the application of *William F.* in *People v. Bonin* (1988) 46 Cal.3d 659, 695, footnote 4, as is explained below.

11

very absence thereof, the record fails to reflect what different direction the proceedings might have taken and what different results might have obtained." (*William F.*, *supra*, at p. 256.) Thus, "it would be futile for us to attempt to measure prejudice on the basis of an argument which [the juvenile]'s counsel never had the opportunity to present." (*Ibid.*, fn. omitted.) The Ninth Circuit has gone even further and found structural error even when the trial court did not completely deny closing argument, and merely forbade defense counsel from arguing a specific theory of the case. (E.g., *U.S. v. Miguel* (9th Cir. 2003) 338 F.3d 995, 1003; *Conde v. Henry* (9th Cir. 1999) 198 F.3d 734, 741.)

But not every case has supported a rule of structural error for denial of closing arguments. In *Glebe v. Frost* (2014) 574 U.S. 21 [135 S.Ct. 429, 190 L.Ed.2d 317], a federal habeas case in which the petitioner was required to demonstrate that the state court's decision was contrary to " 'clearly established Federal law, as determined by the Supreme Court' " (*id.* at p. 24, quoting 28 U.S.C. § 2254(d)(1)), the United States Supreme Court declined to state whether *Herring* stood for the proposition that the complete denial of closing argument was structural error. (*Glebe*, *supra*, at p. 24.) The court held that the Ninth Circuit cases finding structural error for lesser denials of argument were irrelevant in the federal habeas context because they did not reflect clearly established Supreme Court law. (*Ibid.*) Our Supreme Court has also cautioned against too-broad application of its holding in *William F.* In *People v. Bonin*, *supra*, 46 Cal.3d 659, overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, footnote 1, the court held that the trial court erred by allowing only one defense counsel to argue, despite state law providing that in capital cases, "two counsel on each side may

12

argue the cause." (§ 1095.)  This error did not require reversal, however (*Bonin*, *supra*, at p. 694); the court clarified that "error adversely affecting defense counsel's closing argument" without denying argument completely does not "necessarily infringe[] on the defendant's constitutional right to the assistance of counsel." (*Id.* at p. 695, fn. 4.)

Although it is not directly on point, our Supreme Court's analysis of prejudice in *Lynch* is instructive.  In that case, the court held that the newly enacted right to a jury trial on aggravating factors applied retroactively to certain defendants convicted under the former version of section 1170. (*Lynch*, *supra*, 16 Cal.5th at pp. 748-749.)  The defendant in *Lynch* argued that the lack of a jury finding on any aggravating circumstance was structural error, in part because it did not permit defense counsel " 'to decide how to present their case in a way that gives them a reasonable opportunity to be heard.' " (*Id.* at p. 752.)  The court rejected that argument because the defendant was not completely denied a trial by jury.  The lack of a jury trial on aggravating facts was equivalent to the failure to instruct the jury on an element of an offense.  Such an "omission is not prejudicial if the reviewing court concludes beyond a reasonable doubt that 'a rational jury would have found the defendant guilty' upon proper instruction." (*Id.* at pp. 750-751, quoting *Neder v. United States*, *supra*, 527 U.S. at p. 18.)

Cardenas's case can be understood as analogous to *Lynch*. The trial court here did not completely deny closing argument, as in *Herring* or *William F.*, but rather denied it only as to a single aspect of the case.  In *Lynch*, the defendant was denied both his right to a jury trial on aggravating sentencing factors and his right to have counsel decide how to present those factors to the

13

jury. Cardenas had a trial by jury on the aggravating sentencing factors but was deprived of the opportunity to have his counsel present those factors to the jury. It would thus appear to be a logical extension of *Lynch*'s reasoning that the error which occurred here is not structural and should be evaluated under the *Chapman* standard.

We need not ultimately decide this question because even if we analyze for prejudice under *Chapman*, the People have failed to show the error was harmless beyond a reasonable doubt. In *Lynch*, the court applied the *Chapman* standard to a refusal of a jury trial on aggravating factors: such a denial "is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court to justify an upper term sentence, or that those facts were otherwise proved true in compliance with the current statutory requirements." (*Lynch*, *supra*, 16 Cal.5th at p. 768.) In this case, the only aggravating circumstance the trial court expressly relied on in imposing the upper term for the firearm enhancement was that "[t]he victim was particularly vulnerable." (Cal. Rules of Court, rule 4.421(a)(3).)[5] Under the

---

[5] The People argue that "[a]ny error [in denying closing argument] also was harmless because 'a single valid [aggravating] factor . . . is sufficient to justify an upper term' (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1759), and there are two other aggravating factors upon which the court could rely to impose the high term for the gun enhancement" apart from Simmons's vulnerability. But Cardenas's attorney was denied closing argument on the other two aggravating factors as well, so they suffer from the same problem. Further, even if we assume the existence of the two other factors—that Cardenas used a

14

*Chapman* standard, the error in denying closing argument requires reversal unless we can conclude beyond a reasonable doubt that the jury would have found that aggravating circumstance true even if defense counsel had had an opportunity to argue the issue to the jury.

The People contend that any error in denying Cardenas's attorney an opportunity to argue the aggravating circumstances was harmless "in light of the overwhelming evidence that the victim was vulnerable." The court instructed the jury based on CALCRIM No. 3226 that "[p]articularly vulnerable includes being defenseless, unguarded, unprotected, or otherwise susceptible to the defendant's criminal act to a special or unusual degree. In determining whether . . . Simmons was particularly vulnerable, you should consider all the circumstances surrounding the commission of the crime, including the characteristics . . . and the manner and setting in which the crime was committed." The People argue Simmons

---

weapon (Cal. Rules of Court, rule 4.421(a)(2)) and inflicted great violence or great bodily harm (*id.*, rule 4.421(a)(1))—was undeniable, a violation of a defendant's Sixth Amendment right as to an aggravating factor "is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true *all* of the aggravating facts relied upon by the trial court to justify an upper term sentence (*Lynch*, *supra*, 16 Cal.5th at p. 768, italics added). In other words, the "prejudice inquiry does not allow us to uphold the trial court's imposition of an upper term sentence based on some subset of aggravating facts. . . . Under this circumstance, '[i]t is no answer to say that the defendant could have received the same sentence with or without that fact.' " (*Id.* at p. 761.)

unquestionably met this definition because he was only 15 years old, was unarmed, and was fleeing when Cardenas shot him.

But those factors might not have been apparent to Cardenas, who testified that he had never been to the location of the shooting before, and that it was dark outside. He claimed he believed Simmons was armed, and that Simmons was reaching into his waistband, possibly for a weapon, both before and after he began running. He also stated he believed Simmons was in his 20s and feared that Simmons was not alone. The jury's decision to convict Cardenas of voluntary manslaughter rather than murder suggests the jurors found his testimony at least partly credible. The jury was instructed on voluntary manslaughter on the theories of provocation and self-defense. Thus, the jurors must have concluded either that Cardenas's reason "was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from passion rather than from judgment" (CALJIC No. 8.42), or that Cardenas killed Simmons "in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury" (CALJIC No. 5.17). Either theory is consistent with Cardenas's testimony that he was afraid of Simmons and saw him as a potential threat, and not a helpless unarmed youngster. The verdict thus suggests the jurors would have been open to argument from Cardenas's attorney that Simmons was not particularly vulnerable. Because there is a reasonable doubt that argument on the aggravating circumstances might have led to a different result, the error in denying Cardenas's attorney an opportunity to argue the aggravating circumstances was not harmless under *Chapman*.

16

## DISPOSITION

The jury's findings on the aggravating circumstances are reversed, and the upper-term sentence for the firearm enhancement is vacated. The judgment is otherwise affirmed. On remand, the People may retry Cardenas on the aggravating circumstances, or they may accept a reduction to the middle-term sentence for the firearm enhancement.

CERTIFIED FOR PUBLICATION


WEINGART, J.


We concur:



ROTHSCHILD, P. J.



BENDIX, J.

17